## Staunton

TRAVELERS INDEMNITY COMPANY v. M. G. FORD.

September 8, 1967.

Record No. 6472.

Present, All the Justices.

*Harry E. McCoy (Peter W. Rowe; Philip E. McCarthy; Seawell, McCoy, Winston & Dalton*, on brief), for appellant.

*John F. Rixey (Rixey & Rixey*, on brief), for appellee.

SNEAD, J., delivered the opinion of the court.

On August 6, 1963, M. G. Ford filed a bill of complaint against The Travelers Indemnity Company, defendant, praying that a liability insurance policy issued by defendant on a certain tractor-trailer owned by him be reformed to include fire and theft coverage, and that he be awarded judgment in the sum of $6,515.14 under the reformed policy for damages sustained to the units "while being operated by unauthorized persons". Ford alleged, among other things, that because of "the inequitable conduct, inadvertence, accident or mistake" on the part of defendant's agent, fire and theft coverage had been omitted. In its answer, defendant denied this allegation and asserted that the loss was not one which would have been insured against even if fire and theft coverage were included in the insurance contract.

Initially, Ford had filed a motion for judgment against defendant

and its agent, J. E. Heslep, Jr., seeking damages as a result of the alleged negligent issuance of the policy in question. Defendant filed a plea of the statute of limitations, but it was not brought to the court's attention until after the jury was impaneled. The court then overruled the plea and stated that should the verdict be for plaintiff the plea would be reconsidered. The jury returned a verdict for plaintiff; and before any judgment was entered on the verdict, Ford instituted the present chancery suit seeking reformation and recovery.

It was agreed that the transcript of the testimony in the law action was to be considered as the record in the chancery suit and the case was submitted to the court upon memoranda by counsel.

The court in a letter opinion sustained defendant's plea of the statute of limitations in the action at law. It also held that Ford's policy should be reformed to include theft coverage because there was "no reasonable doubt that there was an innocent omission of theft coverage contrary to the intention of both parties and under a mutual mistake". The court further ruled "that an unauthorized use of the motor vehicle is proven by the evidence and constitutes a 'theft' under the language of the policy as reformed". On March 17, 1966, the court entered a decree granting Ford substantially the relief prayed for and we awarded defendant an appeal.

Defendant poses these questions for our consideration: (1) "Was there a showing of a mutual mistake of fact and an innocent omission of a material stipulation, such as to give rise to a proper case for reformation?"; and (2) "Did the plaintiff prove a taking of the vehicle which would support a recovery under the 'theft' provision of the policy, as reformed?"

The evidence may be summarized as follows:

Ford, the complainant, was an independent dealer who bought farm produce and sold it to retailers in the Norfolk area. In June 1959, defendant issued Ford a liability insurance policy on his 1950 Mack tractor and his 1954 Great Dane refrigerator trailer. The policy did not provide fire and theft coverage. In February 1960 Ford replaced the Mack tractor with a 1954 Autocar tractor because the "Mack was worn out."

Ford testified that he telephoned J. E. Heslep, Jr., a personal friend and an agent of defendant in Richmond, from the office of Mutual Savings & Loan Company in Norfolk, which had agreed to finance the Autocar tractor. He requested Heslep to substitute his newly acquired tractor for the old one and to add fire and theft insurance

coverage to the policy because such insurance was necessary in order to secure the loan. The substitution was accordingly made, but fire and theft coverage was not added to the policy. In July 1960 the policy was renewed without fire and theft coverage. Ford did not read the policy.

Wyle N. Dillon was employed as a driver and helper on Ford's tractor-trailer. On November 3, 1960, Ford and Faris Gimball purchased about 700 bushels of apples in the Valley of Virginia which were loaded on the trailer and brought to Norfolk for sale. Dillon, who had accompanied Ford and Gimball on the trip, drove the loaded unit to his home in Norfolk with Ford's permission and parked it. The next afternoon Dillon drove it to Elizabeth City, North Carolina (a distance of about 42 miles) for the purpose of selling some of the apples to his father who was a "huckster". He took with him a neighbor, Charles L. Cassidy, to assist in the driving and unloading of the apples. Dillon sold 40 bushels of the apples to his father. He requested Cassidy to drive back to Norfolk because he (Dillon) had drunk "a couple of bottles of beer." On the way back to Norfolk that evening, the tractor-trailer, while being operated by Cassidy, ran off the shoulder of Route 17, hit several trees, turned over and was damaged extensively.

Dillon testified that he frequently took the truck home at night; that on this occasion he told Ford that he was going to drive the truck to North Carolina and sell some of the apples to his father; that the trip was made with Ford's permission, and that he informed Ford that he "was going to pick us somebody to go with me."

On the other hand, Ford said that Dillon did not tell him that he planned to drive the tractor-trailer to North Carolina, and that he did not give him permission to make the trip "at any time." Ford testified that he permitted Dillon to drive the loaded truck home, because he had no other way to get there; that he instructed Dillon to park the truck in front of his house and lock it; that he "would pick it up", and that he had allowed Dillon to drive the truck home several times during his employment.

Trooper R. L. Eley arrived at the scene of the accident shortly after it occurred and neither Dillon nor Cassidy was present. A motorist informed Eley that the two occupants had gone to call a wrecker and the police. Ford was notified through the police of the mishap and he immediately went to investigate it. Cassidy, whom Ford said he had never seen before, returned to the scene after Ford had

arrived. According to Eley, Cassidy said that a car forced him off the road. Eley charged Cassidy with reckless driving, but the charge was dismissed in court. Ford procured warrants against both Dillon and Cassidy charging them with unauthorized use of his vehicle. The grand jury failed to indict them.

On the day following the accident Ford telephoned Heslep, defendant's agent in Richmond, and reported his loss. "I asked him was it covered, and he said yes, it was. He said, 'get estimates on the truck and bring them to Richmond.'" Ford secured estimates of the damages to his tractor-trailer and exhibited them to Heslep who was then in a hospital recovering from an operation. Ford stated that Heslep told him to take the estimates to his office and they "would be taken care of", and that he delivered the estimates to Heslep's secretary. Ford was subsequently contacted by defendant's adjuster who advised that the company would not pay the claim. Ford then called Heslep who said that the matter was "out of his hands" and advised him to "get a good lawyer."

Heslep stated that he was requested by Ford to add fire and theft coverage on the tractor-trailer, and that he told Ford "that I was going to cover him". He said that in order to write the coverage he needed "[t]he identification number, and also the price of the vehicle and the age, and a full description of the type * * *", so he wrote Mutual Savings & Loan Company in Norfolk, which financed the tractor, for that information. Failing to receive a reply to his letter, he talked on the telephone to an employee of Mutual and asked that the requested information be forwarded him because he was leaving "for three weeks on my honeymoon". He was told that the information would be sent "as soon as possible".

Heslep then left on his honeymoon. Upon his return he did nothing more on Ford's policy because "I was under the impression that it [the requested information] did come in. I do not do clerical work there. When the mail is opened I don't look at all the mail that is handled by my secretary. I thought it had been issued. I was under the assumption the whole time that it was." Heslep further stated that it was on this assumption that he advised Ford that he was covered when the loss was reported. According to Heslep, the information was never received by either him or his company. However, Ford testified that Heslep went to a truck stop outside of Richmond and secured the serial number of the tractor.

The crucial issue presented is whether the court erred in holding

that the loss due to "unauthorized use" was compensable under the terms of theft coverage of the reformed policy.

Under the reformed policy, theft coverage reads:

"*Coverage G—Theft (Broad Form)*

"To pay for loss of or damage to the automobile, hereinafter called loss, caused by theft, larceny, robbery or pilferage."

Code, § 38.1-9 provides in part:

"Burglary and theft insurance means and includes:

"(1) Insurance against loss of or damage to any property resulting from burglary, theft, larceny, robbery, forgery, fraud, vandalism, malicious mischief, confiscation or wrongful conversion, disposal or concealment by any person or persons, or from any attempt at any of the foregoing * * *."

It will be observed that neither the policy nor the statute includes "unauthorized use" of a motor vehicle as a risk insured against under theft coverage.

We agree, as Ford contends, that ambiguities in an insurance policy are to be construed against the carrier, and that "the law makes every rational intendment to the end that the purpose of insurance, which is that of indemnity, should be effectuated * * *." *Dressler, Adm'x* v. *Insurance Co.*, 200 Va. 689, 692, 107 S. E. 2d 406, 408. However, we find no ambiguity in the language employed in describing the risks insured against under "Coverage G" of the policy. "Contracts of insurance are to be considered according to the sense and meaning of the terms used, and if clear and unambiguous the terms are to be taken in their plain, ordinary and popular sense." 10 Mich. Jur., Insurance, § 24, p. 314.

Virginia has enacted a statute making the unauthorized use of a vehicle a specific crime. Code, § 18.1-164 provides in part:

"Any person who shall take, drive or use any * * * vehicle * * * not his own, without the consent of the owner thereof and in the absence of the owner, and with intent temporarily to deprive the owner thereof of his possession thereof, without intent to steal the same, shall be confined in the penitentiary * * *."

In *Slater* v. *Commonwealth*, 179 Va. 264, 267, 18 S.E. 2d 909, 910, we said:

"The main difference between common law larceny and the statutory offense of unauthorized use is that in the former there must be an intent to deprive the owner of his property *permanently*, while in

the latter the intent is to deprive the owner of possession of his automobile *temporarily* and without any intent to steal the same. The intent with which property is taken determines the offense." See also *Robinson* v. *Commonwealth*, 190 Va. 134, 143, 56 S.E. 367, 371; *Blanks* v. *Gordon*, 202 Va. 295, 298, 117 S.E. 2d 82, 84.

The rule applied in a majority of the jurisdictions which have had occasion to consider theft coverage under the terms of an automobile insurance policy, such as here involved, is that in order to constitute a theft there must be present an intent to permanently deprive the owner of the vehicle. If it is shown that the alleged thief intended to return the vehicle after using it temporarily, there is no theft. See 48 A.L.R. 2d 8, 29 and cases there cited.

In 7 Am. Jur. 2d, Automobile Insurance, § 49, p. 357, it is stated:

"In a number of jurisdictions, the taking of a car, unaccompanied by an intent permanently to deprive the owner of the car, is made a crime separate from the crime of larceny. Under such statutes, a taking without the requisite intent has generally been held not to be within the coverage of a theft policy."

Under the evidence adduced, Dillon and Cassidy were at most guilty of the unauthorized use of Ford's tractor-trailer. There was no showing that either of them had an intent to permanently deprive Ford of his vehicle. In fact, it was not disputed that the tractor-trailer was being returned to Norfolk when it was damaged in the accident.

We hold that loss due to unauthorized use of the vehicle was not one of the risks insured against under the theft coverage of Ford's reformed policy. In view of this conclusion, we do not deem it necessary to decide whether the evidence was sufficient to support a reformation of the policy.

Accordingly, the judgment appealed from is reversed and final judgment is here entered for the defendant.

*Reversed and final judgment.*